MJP/2024R00508

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon.  Esther Salas |
| | : | |
| v. | : | Crim. No. 25-689 |
| | : | |
| WILFREDO AQUINO | : | 18 U.S.C. § 1956(h) |

# I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, and any challenges based on venue, the United States charges:

## GENERAL ALLEGATIONS

1.    At all times relevant to this Information:

   a.  Defendant Wilfredo Aquino ("AQUINO") lived in New York, New York.

   b.  TD Bank, N.A. ("TD Bank") was a financial institution as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation.

   c.  AQUINO was an officer, employee, and agent of TD Bank, and specifically, was an Assistant Store Manager of a TD Bank store in Midtown Manhattan, New York, New York.

2.    TD Bank maintained policies, procedures, and training related to Anti-Money Laundering ("AML"), Anti-Bribery, Anti-Corruption, and its Code of Conduct. Pursuant to these policies and procedures, employees were prohibited from requesting or receiving anything of value in order to influence an act or decision and from falsifying accounts, documents, and records. Employees were also trained to

identify indicators of money laundering and other illicit transactions. TD Bank provided these policies and procedures to all employees and required employees, such as AQUINO, to complete annual AML trainings. AQUINO completed these AML trainings in 2018, 2019, and 2020.

3.     TD Bank and its employees were required to submit Currency Transaction Reports ("CTRs") to the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN") for currency transactions in excess of $10,000. *See* 31 C.F.R. § 1010.311. In CTR filings, TD Bank and its employees were required to identify the person who conducted the transaction (*i.e.*, the conductor) in addition to the account holder. *See* 31 U.S.C. § 5313(a); 31 C.F.R. § 1010.312.

4.     TD Bank provided its employees training on collecting information to be included in CTRs, including the requirement to collect information on the "conductor," *i.e.*, "the person(s) who physically conducts the transaction." AQUINO completed this training in 2018, 2019, and 2020.

### The Money Laundering Scheme

5.     From in or around January 2019 through in or around February 2021, AQUINO leveraged his position at TD Bank to facilitate a money laundering network's movement of hundreds of millions of dollars through TD Bank accounts. AQUINO processed numerous bulk cash deposits by the money laundering network, concealed the identity of the transaction conductor on CTRs, and issued a total of more than $92 million in official bank checks related to the cash deposits. AQUINO also helped the network open new accounts at TD Bank after other accounts of theirs

were closed due to suspicious activity. In return, AQUINO accepted thousands of dollars in retail gift cards from the network.

6.    Between January 2018 and February 2021, Da Ying Sze, who was known to AQUINO as "David," and his co-conspirators (collectively, "David's Network") moved approximately $474 million through TD Bank accounts by depositing cash at TD Bank stores in New York, New Jersey, and elsewhere. In February 2022, David pleaded guilty to coordinating a $653 million money laundering conspiracy, operating an unlicensed money transmitting business, and bribing bank employees in connection with financial transactions.

7.    In furtherance of his scheme, David typically set up shell companies using nominee (or straw) owners and opened bank accounts in the names of those nominees and shell companies at TD Bank. David then deposited millions of dollars in cash to these nominee-owned accounts and immediately moved the deposited funds using official bank checks, personal and business checks, and domestic and international wire transfers to the United States, China, Hong Kong, and elsewhere—all while he was neither an accountholder nor a signatory. David's Network also moved a substantial amount of illicit funds through TD Bank personal accounts, and in some instances David told TD Bank employees, including AQUINO, that he was using the personal accounts for business transactions because they incurred fewer bank fees.

8.    Throughout his money laundering scheme, David distributed gift cards to TD Bank employees, including AQUINO, to ensure that they would continue processing his transactions.

9.    While David's Network utilized numerous TD Bank stores to conduct its money laundering activity, it laundered the most money through AQUINO's Midtown Manhattan store. Nobody processed more transactions for David's Network at the Midtown Manhattan store than AQUINO. In fact, David had AQUINO's telephone number saved in his phone contacts as "Td Wilfredo Broadway," and the two periodically exchanged text messages about David's account activity.

10.   Starting in mid-2019, AQUINO received communications indicating that David's Network was engaged in money laundering. For example:

    a.   In mid-2019, AQUINO's Midtown Manhattan store filed two Unusual Transaction Referrals ("UTRs"), store-level reports identifying unusual activity, on accounts linked to David's Network. AQUINO escalated the conduct identified in the UTRs to his regional manager.

    b.   In or around August 2020, after an outgoing $200,000 wire from one of David's Network's accounts was flagged for compliance review, AQUINO received an internal TD Bank email exchange in which a co-worker wrote, "You guys really need to shut this down LOL."

    c.   In or around September 2020, AQUINO received an email from a TD Bank fraud specialist requesting additional information about "highly unusual" cash activity in one of David's accounts. On or about October

4

19, 2020, AQUINO replied, noting that the customers "mainly deal in cash" and that they "use the personal account as it waives the fee's for bank checks." That same day, the fraud specialist replied to AQUINO, in part, "This looks like money laundering, as per Anti-Money Laundering/Terrorist Funding, we cannot encourage the way they are conducting business. Also not only will the bank be held responsible, if this is the case; but those that encouraged the way they are conducting business can also be held responsible. Please review Anti-Money Laundering & Terrorist Funding." AQUINO replied the next day, "I will inform the customer to use their business accounts. Also be advise[d] we have filed CTR/UTR on these customers also." Following this exchange, David's Network continued to use personal accounts to move millions of dollars.

    d. In or around November 2020, AQUINO was informed that four of David's Network's accounts were being closed because "the account activity is not acceptable to TD Bank." AQUINO discussed the closures with a colleague over an internal messaging system, writing: "but the they have other relationships … they don't use that account anymnore."

11.    Throughout David's money laundering scheme, AQUINO processed approximately 1,680 official bank checks for David's Network, totaling more than approximately $92 million. Nearly all of these bank checks were funded with a corresponding cash deposit exceeding $10,000, which triggered TD Bank's legal

requirement to file a CTR. Although AQUINO knew that David was conducting these cash deposits, AQUINO never identified David as the "conductor" on the CTR.

12.    In processing David's deposits, AQUINO repeatedly accepted a digital photo of the absent nominee accountholder's identification instead of requiring David to present his own identification, as required by law and TD Bank policy.

13.    In or around December 2020, AQUINO helped David open at least two new TD Bank accounts in the names of nominee owners and shell companies after certain of David's accounts were closed due to suspicious activity. AQUINO informed David that TD Bank kept closing David's accounts due to excessive automated teller machine ("ATM") cash deposits and recommended that David avoid depositing cash into ATMs for the new accounts.

14.    From on or about February 15, 2021 through on or about February 17, 2021, AQUINO helped facilitate three money laundering transactions for David totaling $1,975,000. For each of these transactions, AQUINO (i) conducted the transaction for David even though the nominee accountholder was not present, (ii) allowed David to present a digital photo of the nominee accountholder's identification, (iii) failed to identify David as the conductor of the transaction in the CTR information, (iv) waived all fees related to the official bank check purchases, and (v) accepted one or more gift cards from David.

15.    On or about February 15, 2021, AQUINO processed a $1,110,000 cash deposit for David and issued 18 official bank checks and then processed another $375,000 cash deposit for David and issued another 10 official bank checks.

6

16.    On or about February 17, 2021, AQUINO processed a $490,000 cash deposit for David and issued eight official bank checks, as captured in the following screenshots from TD Bank surveillance video.

a. As shown below, at approximately 11:18 a.m., AQUINO (right) was processing a large cash transaction for David (left).



b. As shown below, at approximately 12:39 p.m., AQUINO accepted from David a digital photo of an absent nominee accountholder's identification.



c.  As shown below, at approximately 12:53 p.m., David (left) compensated AQUINO (right) with a stack of retail gift cards.



17.  Throughout the scheme, David bribed AQUINO with retail gift cards amounting to approximately $11,490.

18.  On or about February 18, 2021, when AQUINO was asked by supervisors to summarize David's Network's alleged businesses and account activity, AQUINO failed to identify David and omitted material information about several entities and individuals involved in the scheme.

19.  That same day, after many of David's accounts had been closed and the day after TD Bank issued a fraud alert regarding David's "money laundering scheme" to stores in the New York region, including AQUINO's, AQUINO texted David, "Sorry I can't do the cash deposit anymore [sad, crying face emoji]".

## COUNT ONE
(Money Laundering Conspiracy)

20.    The allegations in paragraphs 1 through 19 of this Information are realleged here.

21.    From on or about February 15, 2021 through on or about February 17, 2021, in the District of New Jersey, and elsewhere, the defendant,

**WILFREDO AQUINO**,

did knowingly and intentionally conspire and agree with others to transport, transmit, transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

In violation of Title 18, United States Code, Section 1956(h).

9

## <u>FORFEITURE ALLEGATION</u>

22.    Upon conviction of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as charged in this Information, the defendant,

**WILFREDO AQUINO**,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all property, real or personal, involved in such offense, and all property traceable to such property.

## SUBSTITUTE ASSETS PROVISION

23.    If any of the property described above, as a result of any act or omission of the defendant:

    a)    cannot be located upon the exercise of due diligence;

    b)    has been transferred or sold to, or deposited with, a third party;

    c)    has been placed beyond the jurisdiction of the court;

    d)    has been substantially diminished in value; or

    e)    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461 and 18 U.S.C. § 982(b)(1), to forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

TODD BLANCHE
U.S. Deputy Attorney General

PHILIP W. LAMPARELLO
Senior Counsel

_____
MARK J. PESCE
Assistant U.S. Attorney

_____
MARGARET A. MOESER
Chief, Money Laundering, Narcotics
and Forfeiture Section
United States Department of Justice

Approved:

_R. David Walk, Jr._
R. David Walk, Jr.
Deputy U.S. Attorney